# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JAMES DINKINS,

      Plaintiff,

    v.

J. POTOPE, *et al.*,

      Defendants.

No. 4:19-CV-01460

(Judge Brann)

## MEMORANDUM OPINION

### AUGUST 5, 2020

Plaintiff James Dinkins, a prisoner presently confined at the Federal Medical Center at Springfield in Springfield, Missouri,[1] filed a complaint pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*[2] against Defendants James Potope, Michael Maygar, Captain Hall, Physician's Assistant Bennett-Meehan, and Dr. Brian Buschman asserting an Eighth Amendment medical claim regarding treatment that ultimately resulted in the amputation of a toe. Plaintiff Dinkins also complained of an Eighth Amendment conditions of confinement claim regarding his work assignment.[3]  Presently before the Court is Defendants' motion to dismiss, or in the alternative, for summary judgment, which

---

[1]  The events giving rise to the complaint occurred while Plaintiff was incarcerated at the United States Penitentiary at Allenwood, in White Deer, Pennsylvania.
[2]  403 U.S. 388 (1971).
[3]  Doc. 1.

is ripe for adjudication.[4]  Because the motion is supported by exhibits and documents outside the pleadings and for the reasons that follow, the Court will consider the motion as one for summary judgment and grant it in part.

## I.    FACTUAL BACKGROUND

On July 1, 2009, Plaintiff was sentenced in the United States District Court for the District of Maryland to 480 months' incarceration for conspiracy to distribute and for possession with intent to distribute in violation of 21 U.S.C. § § 841–851 and 21 U.S.C. § 846.[5]  Plaintiff is also serving a life sentence for obstruction of justice for killing someone with a firearm with the intent to prevent that person from attending and providing testimony at an official proceeding in violation of 18 U.S.C. § 1512.[6]  Plaintiff was incarcerated at the United States Penitentiary at Allenwood in White Deer, Pennsylvania from April 2, 2018, until April 11, 2019, where the events giving rise to the complaint occurred.[7]  Named as Defendants are Medical Clinician Dr. Brian Buschman, Senior Physician's Assistant Jody Bennett-Meehan, Health Services Administrator James Potope, Assistant Health Services Administrator Michael Magyar, and Captain Michael Hall.[8]  Plaintiff alleges that between April 3, 2018 and August 28, 2018, Defendants all acted with racially

---

[4]    Docs. 10 (motion), 21 (pl.'s opposition), 23 (defs.' reply).
[5]    Doc. 17 at 2.
[6]    *Id.*
[7]    *Id.*
[8]    *See* Doc. 1.

2

discriminatory motive to deny him proper diabetic shoes, medical treatment, and an appropriate prison job.[9]

The Defendants were all employed at USP Allenwood during the time that Plaintiff received medical treatment there, and two of the defendants are members of the United States Public Health Service.  Specifically, Defendant Brian Buschman, M.D., has been employed as a medical officer at the Federal Correctional Complex in White Deer, Pennsylvania since April 11, 2010; he received a commission in the United States Public Health Service on September 4, 2015.[10]  As a medical officer, Dr. Buschman performs inmates' physical examinations, collects inmates' comprehensive medical and social histories, orders appropriate diagnostic testing, and provides treatment and/or medications as needed.[11]  Dr. Buschman is also responsible for referring inmates to specialists or local hospitals when necessary.[12]  Defendant Jody Bennett-Meehan has been employed by the BOP as a Physician's Assistant since July 2000, and received a commission in the United States Public Health Service in May 2008.[13]

When he first arrived at USP Allenwood on April 2, 2018, Plaintiff received an initial health screening.[14]  On April 4, 2018, Dr. Buschman saw Plaintiff for a

---

[9]   *See id.*, Doc. 2.
[10]   Doc. 17 at 2.
[11]   *Id.* at 3.
[12]   *Id.*
[13]   *Id.*
[14]   *Id.*

fourteen day encounter/chronic care clinic examination, where he noted that Plaintiff had a history of diabetes mellitus, esophageal reflux, hyperlipidemia, hypertension, peripheral vascular disease, polyneuropathy in diabetes, and chronic kidney disease.[15]   On April 4, 2018, Dr. Buschman adjusted and renewed Plaintiff's medications, ordered an ophthalmology consultation, laboratory requests, scheduled chronic care follow-up for complications related to diabetes, and provided Plaintiff with a cane, medical shoes, and compression socks.[16]

On April 9, 2018, Plaintiff's assigned physician assistant, non-defendant PA Wood, saw Plaintiff in a sick call encounter where he complained that his shoes had caused swelling and inflammation of his legs.[17]   PA Wood noted that Plaintiff had two open wounds on his lower left leg secondary to peripheral vascular disease and provided prescription medications, compression stockings, bacitracin ointment, and instructed him on proper wound care.[18]   She also submitted a request for "proper diabetic shoewear" and instructed Plaintiff to return to the clinic to have his wounds rechecked.[19]   Plaintiff returned to Health Services on April 12, 2018, where PA Wood provided zinc oxide ointment to be applied to the wounds on Plaintiff's left shin, and noted that he had no symptoms of systemic illness.[20]

---

[15]   *Id.* at 4.
[16]   *Id.*
[17]   *Id.*
[18]   *Id.*
[19]   *Id.*
[20]   *Id.* at 5.

On April 13, 2018, Health Services provided Plaintiff a preventative health visit.[21]  It is unclear from Defendants' statement of facts but it appears that this was a routine appointment and unrelated to the wounds for which Plaintiff was being treated.

On April 17, 2018, PA Wood again saw Plaintiff to follow up on his wound care, noting that he still had three lesions on his left shin, but that there was no evidence of cellulitis, purulent drainage, or systemic illness.[22]  PA Wood issued him a prescription to relieve pain resulting from diabetic neuropathy.[23]  Two days later, PA Wood noted that the three lesions on Plaintiff's shin had closed over since he started using zinc oxide and advised Plaintiff to wear compression stockings daily.[24]

On April 19, 2018, an outside orthotics specialist evaluated Plaintiff and recommended orthotic shoes with extra insoles so they could be replaced quarterly.[25] Plaintiff told the orthotics specialist he required composite toe boots for work as well as sneakers to wear when he was not working.[26]  The orthotics specialist recommended sneakers so that Plaintiff could wear them when he was not working.[27]

---

[21]  *Id.*
[22]  *Id.*
[23]  *Id.*
[24]  *Id.*
[25]  *Id.*
[26]  *Id.* at 6.
[27]  Doc. 22-1 458.

A quote to order for the shoes produced that day, however it appears that the shoes were not ordered on that day.[28]

On July 2, 2018, Plaintiff stopped Dr. Buschman in the corridor to complain that he had not yet received his custom shoes, and that the BOP approved him to have either the sneakers or work boots, but not both.[29]  Dr. Buschman instructed Plaintiff to come to sick call to have his complaints addressed, informing him that the hallway is not an appropriate place for a medical evaluation; Plaintiff did not want to report to sick call because inmates are required to pay a co-pay.[30]

Later that day, after the encounter with Plaintiff, Dr. Buschman reviewed Plaintiff's medical records and noted that he had thirty-four documented episodes of care since his arrival at USP Allenwood, that he had not reported to sick call in approximately five weeks, and that Plaintiff's stated need for two pairs of diabetic shoes was inconsistent with the recommendation of the consultant.[31]  At some point Plaintiff elected to get the sneakers, which were delivered to him on July 16, 2018, according to a note on the order form.[32]  The quote/order form for the sneakers put together by the orthotics provider is provided as an exhibit by Defendants.  There is a digital signature stamp for Michael Magyar on the orthotics quote/order form.[33]

---

[28]  *Id*. at 442.
[29]  Doc. 17 at 6.
[30]  *Id.*
[31]  *Id.*
[32]  Doc. 22-1 at 442.
[33]  *Id.*

The signature stamp is dated July 2, 2018.[34]  From these documents, it appears that Plaintiff elected to receive the sneakers on July 2, 2018, the same day he spoke with Dr. Bruschman, and that the order was approved that day.

A later medical record contains an administrative remedy response by HSA Potope, dated October 18, 2018, and explains the delay in the provision of the diabetic shoes.  Specifically, it provides that Plaintiff was permitted to choose between the diabetic sneakers recommended for him by the orthotics consultant and the boots Plaintiff believed he also required.[35]  Plaintiff would not choose either the sneakers or the boots and thus the order of the shoes was delayed.  Plaintiff ultimately selected and received the sneakers.[36]

On July 25, 2018, PA Wood saw Plaintiff for an open wound on his kneecap.[37] She cultured the wound, prescribed antibiotics, provided him with a fact sheet about on skin infections and the supplies necessary to care for the wound, and instructed him to return in one week for follow-up care.[38]  Plaintiff agreed to comply with the wound care.[39]  On July 30, 2018, Dr. Buschman entered an administrative note that the wound culture came back positive for MRSA, and that Plaintiff was already receiving the appropriate antibiotics and had a follow-up scheduled with his PA in

---

[34] *Id.*
[35] Doc. 17 at 7.
[36] *Id.* at 7.
[37] *Id.*
[38] *Id.*
[39] *Id.*

two days.[40]  PA Wood examined Plaintiff again on August 1, 2018, and noted the wound was no longer open, and that there was no drainage or systemic illness.[41]

On September 13, 2018, Plaintiff saw an outside orthotic/prosthetic provider to discuss his custom sneakers, which did not fit.[42]  The orthotic provider recommended seam free diabetic socks and Apex boots or sneakers.[43]  Health Services approved the requested Apex sneakers; however the orthotics provider discovered that they were unable to be ordered as they did not come in the width needed for Plaintiff.[44]  The orthotics provider recommended BioFit shoes, but Plaintiff refused this shoe, stating that the leather on the shoe is not soft enough.[45]

On September 19, 2018, PA Wood saw Plaintiff at sick call and renewed his prescription for zinc oxide, noting he is prone to blisters and other wounds if his skin is not properly cared for.[46]

On September 28, 2018, Plaintiff reported to sick call because a toe on his left foot was swollen.[47]  At that time, no open areas, drainage, redness, or signs of

---

[40]  *Id.*
[41]  *Id.*
[42]  *Id.* at 8.
[43]  Doc. 22-1 at 458.
[44]  *Id.* at 448.
[45]  *Id.*
[46]  Doc. 17 at 8.
[47]  *Id.*

infection were observed; Plaintiff was therefore scheduled with his primary care provider and advised to report to sick call if his condition changed or worsened.[48]

On October 5, 2018, Plaintiff received an injection of Kenolog and Lidocaine for right foot pain.[49]  During a follow-up visit with PA Wood a few days later on October 10, 2018, Plaintiff complained that he received the wrong pair of diabetic shoes.[50]  PA Wood noted recent lab studies indicated that Plaintiff's diabetes was poorly controlled, that Plaintiff had trace swelling to his lower extremities, but no open sores or ulcerations.[51]  She also noted that health services would follow up with the specialist about  his diabetic shoes.[52]

PA Wood next saw Plaintiff on October 16, 2018, when he complained of pain in the third toe of his left foot.[53]  An examination revealed a half centimeter calloused area on his left third toe with red fleshy skin, but no signs of cellulitis to the surrounding tissues or gangrene, and that he had pitting edema up to his calf.[54]  PA Wood did culture the drainage from the affected area, and ordered x-rays, provided gel inserts and bandages, and ordered Plaintiff to use warm compresses and

---

[48] *Id.*
[49] *Id.*
[50] *Id.*
[51] *Id.* at 9.
[52] *Id.*
[53] *Id.*
[54] *Id.*

to keep the area cushioned and covered with bandages.[55]  The x-ray was performed on October 17, 2018, and revealed possible osteomyelitis.[56]

During a follow-up visit on October 18, 2018 with Plaintiff, PA Wood reviewed the x-ray results and noted that the culture was still pending.[57]  On October 18, 2018, PA Wood assessed Plaintiff with a left third toe infection and possible osteomyelitis; the PA prescribed antibiotic Keflex preemptively, scheduled Plaintiff in the wound clinic for weekly monitoring, ordered new diabetic shoes, issued new pairs of diabetic socks and compression to be worn daily; and instructed Plaintiff to wash the wound with soap and water and to keep it covered.[58]  She also again noted that Plaintiff's diabetes was poorly controlled and that he had been non-compliant with checking blood glucose levels at insulin lines.[59]  In light of this, she encouraged him to comply so that his insulin could be adjusted as needed.[60]

On October 22, 2018, Plaintiff reported to sick call to complain that his infected toe was worsening and requested that it be drained, but a PA noted the wound was not conducive to draining.[61]  The results of the culture were available after sick call, and they indicated that four organisms grew.[62]  That day, the PA

---

[55]  *Id.*
[56]  *Id.*
[57]  *Id.*
[58]  *Id.* at 10.
[59]  *Id.*
[60]  *Id.*
[61]  *Id.*
[62]  *Id.*

reviewed the culture results with non-defendant Dr. Stahl, who advised that Plaintiff should continue the same antibiotic course and to follow-up with PA Wood as scheduled.[63]

During a wound care encounter on October 30, 2018, minimal drainage was observed.[64]  Plaintiff reported changing his dressings three times each day, and he received knee high compression socks and dressing supplies for the next week.[65] During a follow-up visit with PA Wood on November 6, 2018, Plaintiff reported that the drainage had ceased, but he was experiencing increased left foot pain.[66]  Plaintiff received custom orthotic soft leather boots, and another x-ray was ordered.[67]  It is unclear whether these were the previously recommended BioFit shoes that Plaintiff had refused.

A radiologist compared the November 7, 2018 x-ray to the one performed on October 17, 2018, and noted no change in the suspicion for osteomyelitis and recommended correlation with physical exam.[68]  On November 15, 2018, an outside podiatrist debrided the wound and informed Plaintiff that it would require amputation.[69]  On November 19, 2018, Health Services submitted a consultation

---

[63]   *Id.*
[64]   *Id.*
[65]   *Id.* at 10-11.
[66]   *Id.* at 11.
[67]   *Id.*
[68]   *Id.*
[69]   *Id.*

request for the amputation of Plaintiff's left third toe with recommendations that he remain non-weight bearing and change his dressings daily.[70]

An administrative note entered on November 20, 2018, states that Plaintiff went to Health Services at sick call at 6:45 a.m. and was advised to return at callout at 9:30 a.m. for wound care and to receive a wheelchair.[71]  Plaintiff failed to appear at callout as instructed; Health Services therefore followed up with Plaintiff's housing unit.  Plaintiff informed a correctional officer that he did not report to callout because his foot hurt.[72]

At some point, the facility went on lockdown.  During a dressing change on November 21, 2018, Plaintiff indicated that he understood that he should remain non-weight bearing during lockdown and that he would receive his wheelchair when the lockdown was lifted.[73]  On November 29, 2018, a nurse who was completing the insulin and glucose checks in the housing unit during the lockdown noted that Plaintiff requested a sick call slip and was complaining of pain and swelling.[74]  Later that day, another nurse evaluated Plaintiff in his housing unit, noting that his left foot was warm to the touch and had edema in his left foot to the shin.[75]  Plaintiff was started on an antibiotic and directed to submit a request to see his assigned

---

[70]  *Id.*
[71]  *Id.* at 11-12.
[72]  *Id.* at 12.
[73]  *Id.*
[74]  *Id.*
[75]  *Id.*

provider.[76]  The institution remained on lockdown on November 30, 2018, so PA Wood saw Plaintiff in his cell during insulin line, where he complained of increased pain in his right lower extremity.[77]  PA Wood provided Plaintiff with wound care supplies, advised him to continue taking his antibiotics exactly as directed, increased the dosage of his nerve pain medication, and noted a scheduled podiatrist appointment.[78]  Later on, when a nurse attempted to see Plaintiff in his housing unit for a foot care follow-up, Plaintiff became agitated and refused to speak, so officers escorted him back to his cell.[79]

On December 3, 2018, PA Wood saw Plaintiff for a follow-up evaluation in the housing unit while the institution remained on lockdown.  She ordered an x-ray and an ultrasound to check for cellulitis and stenosis.[80]  The x-ray taken that day showed progression of the osteomyelitis.[81]  Plaintiff was given more antibiotics and provided a wheelchair.[82]

On December 5, 2018, staff found Plaintiff unresponsive in his cell after he had passed out and fallen backwards.[83]  He was then taken to the hospital.[84]  Plaintiff

---

[76]  *Id.*
[77]  *Id.* at 12-13.
[78]  *Id.* at 13.
[79]  *Id.*
[80]  *Id.*
[81]  *Id.*
[82]  *Id.*
[83]  *Id.*
[84]  *Id.*

was conscious at the hospital, but his blood glucose level was elevated with a value of 310. Diagnostic tests ruled out any injury to the head and neck from the fall.[85] Plaintiff was diagnosed with cellulitis, given a prescription, and released from the hospital.[86]

On December 11, 2018, Dr. Buschman was called into the x-ray room where an exchange was occurring between Plaintiff and non-defendant Health Services staff.[87] Plaintiff was simultaneously complaining that he did not want to have his toe amputated and that it was taking too long to schedule the amputation.[88] He asked to be immediately transfer to Geisinger Medical Center and have the amputation that day.[89] Dr. Buschman noted that Plaintiff's behavior was erratic and advised him that the surgery was scheduled to be conducted in the office of the surgeon he had already met, and his request to be transferred to a hospital was not medically indicated or appropriate.[90] Dr. Buschman examined Plaintiff's left foot, noting that his third toe was dark in color as compared to the other toes and that despite Plaintiff's complaints about not having the right size footwear, he was then wearing very narrow athletic shoes.[91] The doctor expressed concern that Plaintiff's noncompliance with footwear,

---

[85] *Id.* at 14.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Id.*
[91] *Id.*

non-weight bearing status, and the use of a wheelchair were contributing to the lack of healing.[92]

On December 19, 2018, Plaintiff underwent the procedure to have his left third toe amputated at the Brookpark Surgery Center.[93]   He was discharged from this facility that same day with a surgical shoe.[94]   He returned to Health Services after surgery and had no complaints of pain.[95]   Health Services ordered Plaintiff pain medication and instructed him to ice the surgical site and to keep his foot elevated as much as possible.[96]   During Plaintiff's post-op evaluation on December 20, 2018, the bandages were not removed per the surgeon's instructions, Plaintiff refused additional pain medication, and an x-ray was completed.[97]

During a follow-up visit on December 26, 2018, Plaintiff reported there was no drainage present, he was experiencing less pain, and requested to be switched from a wheelchair to a walker with wheels.[98]   On December 26, 2018, a consultation request was submitted for Plaintiff to be seen for a routine podiatry encounter.[99]

---

[92]   *Id.* at 15.
[93]   *Id.*
[94]   *Id.*
[95]   *Id.*
[96]   *Id.*
[97]   *Id.*
[98]   *Id.*
[99]   *Id.* at 16.

On December 31, 2018, Plaintiff was seen at sick call with a complaint that his surgical site may have been filled with fluid and pus.[100]  Medical staff attended to the surgical site and observed some blood but no pus.  Plaintiff was reassured that his surgical site was fine, and that he had a follow-up with the podiatrist soon.[101]

Defendants attach to their statement of facts over 450 pages of Plaintiff's medical records while he was incarcerated at USP Allenwood, as well as a portion of his records from his prior penal institution.[102]  The Court has comprehensively reviewed these records, and notes that there is no record of Defendant Bennett-Meehan treating Plaintiff in relation to his foot problems.  Her only interactions with Plaintiff were limited to checking his blood glucose level approximately six times, and providing Plaintiff with his daily insulin a few times a month.[103]  There appears to be no record of interactions between Plaintiff and Defendant Michael Magyar, although he did update Plaintiff's medical duty status forms on three occasions and his stamped signature appears on the orthotics order form.[104]  There also appears to be no interactions between Plaintiff and Defendant James Potope, other than a

---

[100] *Id.*
[101] *Id.*
[102] *See* Doc. 22-1.
[103] *See id.* at 228-231, 250-64.
[104] *Id.* at 314-325.

grievance response from him.[105]  Finally, there is no record of interactions between

Plaintiff and Defendant Captain Michael Hall according to these exhibits.[106]

## II.    Standard of Review

Summary judgment should be granted when the pleadings, depositions,

answers to interrogatories, admissions on file, and affidavits show that there is no

genuine dispute as to any material fact and that the moving party is entitled to a

judgment as a matter of law.[107]  A disputed fact is material when it could affect the

outcome of the suit under the governing substantive law.[108]  A dispute is genuine if

the evidence is such that a reasonable jury could return a verdict for the nonmoving

party.[109]  The Court should view the facts in the light most favorable to the non-

moving party and make all reasonable inferences in that party's favor.[110]  When the

non-moving party fails to refute or oppose a fact, it may be deemed admitted.[111]

Initially, the moving party must show the absence of a genuine issue

concerning any material fact.[112]  Once the moving party has satisfied its burden, the

non-moving party, "must present affirmative evidence in order to defeat a properly

---

[105]  *Id.* at 446.

[106]  *See generally* Doc. 22-1.

[107]  Fed. R. Civ. P. 56(c).

[108]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[109]  *Id.* at 250.

[110]  *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[111]  *See* Fed. R. Civ. P. 56(e)(2); Local R. 56.1 ("All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.").

[112]  *See Celotex Corp. v. Carrett*, 477 U.S. 317, 323 (1986).

supported motion for summary judgment."[113]   "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla."[114]   "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.[115]

If the court determines that "the record taken as a whole could not lead a rational trier or fact to find for the non-moving party, there is no 'genuine issue for trial.'"[116]   Rule 56 mandates the entry of summary judgment against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[117]

Here, Plaintiff has failed to oppose the motion or the facts asserted in Defendant's statement of facts.[118]   Pursuant to Federal Rule of Civil Procedure 56(e),[119] the Court has reviewed the statement of facts as well as each fact's citation to the record and will consider each fact undisputed.[120]   A thorough and

---

[113]   *Anderson*, 477 U.S. at 257.

[114]   *Hugh*, 418 F.3d at 267 (citing *Anderson*, 477 U.S. at 251).

[115]   Fed. R. Civ. P. 56(e)(2)-(3).

[116]   *Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

[117]   *Celotex Corp.*, 477 U.S. at 322.

[118]   Plaintiff did provide various medical records from his time at USP Allenwood, however these are duplicates of records provided by Defendants in support of their motion.

[119]   *See* Fed. R. Civ. P. 56(e)(1).

[120]   *See* Fed. R. Civ. P. 56(e)(2).

comprehensive review of the record makes clear that no material fact is in dispute as to the dispositive issue in this case.  As such, summary judgment is appropriate.[121]

## III.   DISCUSSION

### A.   Defendants Dr. Buschman and Physician's Assistant Bennett-Meehan

Both Defendants Dr. Buschman and Bennett-Meehan are members of the Public Health Service.  Pursuant to 42 U.S.C. § 233(a), members of the Public Health Service are immune from suit in a *Bivens* action if the injury for which compensation is sought resulted from the performance of a medical or related function while acting within the scope of their office or employment.[122]   Plaintiff's claims against Defendants Dr. Buschman and Bennett-Meehan involve the medical treatment he did or did not receive.   Both the allegations in Plaintiff's complaint and the undisputed facts demonstrate that both Defendants were acting within the scope of their employment by performing medical or related functions, including the assessment of whether medical care is needed or when it is needed.  Therefore, in accordance with 42 U.S.C. § 233(a), Defendants Dr. Buschman and Bennett-Meehan

---

[121]   *See* Fed. R. Civ. P. 56(e)(3) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it.").

[122]   *See Hui v. Castaneda*, 559 U.S. 799 (2010) (holding Public Health Service Act, 42 U.S.C. § 233(a), precludes *Bivens* actions against Public Health Service personnel for constitutional violations arising out of their official duties); *Cuoco v. Moritsugu*, 222 F.3d 99, 107 (2d Cir. 2000).  The appropriate and exclusive remedy against members of the Public Health Service is an action against the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et. seq.  See Anderson v. Bureau of Prisons*, 176 F. App'x 424, 243 (3d Cir. 2006).

are immune from *Bivens* liability, and the Court will grant summary judgment in their favor.

### B.    Defendants Potope and Maygar

Plaintiff alleges that Defendants Potope and Maygar denied or delayed his medical treatment and orthotic shoes, and did so in a discriminatory manner. Plaintiff has brought this claim under the Eighth Amendment pursuant to 42 U.S.C. § 1983, which provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

"To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color of state law."[123]   "The first step in evaluating a section 1983 claim is to 'identify the exact contours of the underlying right said to have been violated' and to determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"[124]

---

[123]  *Moore v. Tartler*, 986 F.2d 682, 685 (3d Cir. 1993).

[124]  *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998)).

"In order to state a cognizable [medical] claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.  It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment."[125]  "[T]o succeed under these principles, plaintiffs must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious."[126]  This standard affords considerable latitude for medical professionals within a prison to diagnose and treat the medical problems of inmate patients.[127]  Some of the more common situations in which "deliberate indifference" has been found include when the defendant knows of a prisoner's need for medical treatment but intentionally refuses to provide it, delays necessary medical treatment based on a non-medical reason, and prevents a prisoner from receiving needed or recommended medical treatment.[128]

The Court has comprehensively reviewed Plaintiff's medical records.  At no point was Defendant Potope involved in Plaintiff's medical care or decision making.  His only mention in the medical records is a response to Plaintiff's grievance.  A

---

[125] *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

[126] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[127] *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979); *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996).

[128] *Id.*

lack of personal involvement or involvement limited to responding to grievances is insufficient to establish *Bivens* liability.[129]

Defendant Maygar's involvement in Plaintiff's medical care or treatment is limited to apparently approving his request for diabetic shoes based on his stamped signature on the othotics order form.  Although the approval of these shoes was delayed for a few months, it is clear from the undisputed facts that the delay was caused by Plaintiff's failure to select either orthotic sneakers or work boots.  Notably, the orthotic specialist never recommended that Plaintiff receive both; in fact, he recommended that Plaintiff choose the sneakers.  The record further demonstrates that the request for orthotic sneakers was approved by Defendant Maygar the same day that Plaintiff elected to receive the sneakers - on July 2, 2018.

Finally, to the extent that Plaintiff alleges that these Defendants acted with a discriminatory motive in denying or delaying his medical care, it is clear that at no time were these Defendants involved in Plaintiff's medical care, other than through Defendant Maygar's approval of Plaintiff's orthotic shoes—approval which he promptly granted once Plaintiff had elected to receive sneakers.  Any allegations that

---

[129] "A defendant in a civil rights action 'must have personal involvement in the alleged wrongs to be liable,' and 'cannot be held responsible for a constitutional violation which he or she neither participated in nor approved.'" *Baraka v. McGreevey,* 481 F.3d 187, 210 (3d Cir. 2007).  *See also Pressley v. Beard*, 266 F. App'x 216 (3d Cir. 2008) (prison officials cannot be held liable solely based on their failure to take corrective action when grievances or investigations were referred to them); Further, supervisory liability cannot be imposed under § 1983 by *respondeat superior.  See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Rizzo v. Goode*, 423 U.S. 362 (1976).

Plaintiff makes regarding comments these Defendants may have made to him based on his race or religion in his affidavit supporting his complaint are nothing more than verbal threats or harassment, and are thus insufficient to establish an Eighth Amendment violation.[130]

There are simply no facts to establish that either Defendant intentionally refused to provide medical treatment, delayed treatment based on a non-medical reason, or prevented Plaintiff from receiving medical treatment—or that any such decisions were motivated by racial or religious animus.  The record demonstrates that Plaintiff received appropriate and timely medical care, and any delay in his treatment was caused by Plaintiff himself.  As such, the Court will grant the motion in favor of Defendants Potope and Maygar.

### C.  Defendant Captain Hall

Plaintiff alleges that Defendant Captain Hall refused to change his prison job assignment to an assignment in Food Service and that he received lower pay than other prisoners at USP Allenwood.  Prison inmates lack a protected liberty or property interest in prison employment.[131]  "The right to earn wages while incarcerated is a privilege, not a constitutionally guaranteed right.  An inmate's expectation of keeping a specific prison job, or any job, does not implicate a

---

[130] *See Robinson v. Taylor*, 204 F. App'x 155, 156 (3d Cir. 2006) ("It is well settled that verbal harassment of a prisoner, although deplorable, does not violate the Eighth Amendment.").

[131] *See James v. Quinlan*, 866 F.2d 627, 630-31 (3d Cir. 1989).

protected property interest."[132]   Further, it is clear that Plaintiff was under the medical treatment of medical professionals and receiving treatment.  As Defendant Hall correctly points out, "[i]f a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."[133]   While that may be true, it is also true that a prisoner-plaintiff may state an Eighth Amendment conditions of confinement claim when a prisoner is forced to do work that causes injury.[134]   "In this type of case, the plaintiff must prove that the defendants knowingly compelled [the prisoner] 'to perform labor that is beyond an inmate's strength, dangerous to his or her life or health, or unduly painful'"[135]

Here, the undisputed medical records provide that for the relevant time period, Plaintiff's medical duty status form restricted him from work that involved, *inter alia*, "prolonged standing" or "safety shoes."[136]   What is not clear from the record is whether Defendant Hall knew of these restrictions, whether Plaintiff's worked

---

[132]   *Wilkins v. Bittenbender*, No. 04-cv-2397, 2006 WL 860140, *9 (M.D. Pa. Mar. 31, 2006) (quoting *Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995)).

[133]   *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

[134]   *See, e.g., Williams v. Norris*, 148 F.3d 983 (8th Cir. 1998) ("The evidence in the record supports the findings that [plaintiff] had a medical restrictions on his duties, that [defendants] knew of the restrictions, that his work assignment was contrary to the restrictions, and that neither official took action to rescue him from work that was dangerous to his health and that in fact resulted in damage to him.").  *See also Johnson v. Townsend*, 314 F. App'x 436, 440-41 (3d Cir. 2008).

[135]   *Williams,* 148 F.3d at 987.

[136]   *See* Doc. 22-1 at 332.

required prolonged standing or safety shoes, or whether Plaintiff's injuries resulted from his work assignment.

Because the evidence of record fails to address Plaintiff's work assignments and Defendant Hall has not addressed whether judgment is appropriate in his favor on a conditions of confinement claim, the Court will deny summary judgment on this issue.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part the motion for summary judgment and deny it regarding the conditions of confinement claim against Defendant Hall.  Within thirty days from the date of this memorandum opinion, Defendant Hall may refile a motion for summary judgment on the conditions of confinement claim.  An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
United States District Judge